HARRIS JOFFE AND MORRIS MANKOWITZ, TRAD-
ING AS JOFFE & MANKOWITZ, *vs.* THE NIAGARA
FIRE INSURANCE COMPANY OF NEW YORK.

*Fire insurance; "iron safe" clause; "building actually open
for business."*

The "iron safe" clause in fire insurance policies requires the
keeping of books giving a complete record of business trans-
actions, including all purchases, sales and shipments, for cash
or credit, from the date of the inventory, during the continu-
ance of the policy, and the keeping of such books, locked in a
fireproof safe at night, and at all times when the *building is
not actually open for business,* or in some place not exposed
to a fire which would destroy the building. *Held,* such a
clause should receive a fair and reasonable interpretation,
and in interpreting it courts are largely governed by the
circumstances of each particular case.                    p. 160

Where there is no question of the loss having been caused by
the fault or negligence of the owner, courts shrink from plac-
ing an interpretation on clauses of this kind which would
deprive the owner of the right to recover.                p. 160

But when the terms of the contract are clear and unambig-
uous courts have no right to make new contracts for the
parties or ignore those already made, simply to avoid seem-
ing hardship.                                              p. 160

Where a store was left vacant and locked up for half an hour
while the shopkeeper and attendants went to lunch, the store
was not *"actually open for business"* within the meaning of
this clause, and, the books not having been kept in a fire-
proof safe or other place of safety while the store was so
left, during which time the store, books and goods were
burned, it was *held,* that there could be no recovery under the
policy.                                                    p. 161

If an assured, acting in good faith, places the books in a safe which he wrongly believed to be fireproof, or in some place which he mistakenly believes not exposed to a fire that would destroy the building, his mere failure to produce the books would not necessarily bar his recovery under a policy with this clause.                                                p. 162

An insurance policy, insuring a stock of goods and fixtures, contained a stipulation, providing for a forfeiture, in these words: "This policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon." *Held,* that the contract was an entirety and the forfeiture applied as well to the fixtures as to the goods.

p. 165

*Decided June 23rd, 1911.*

Appeal from the Baltimore City Court (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, PATTISON, URNER and STOCKBRIDGE, JJ.

*George R. Gaither,* for the appellant.

*W. Calvin Chesnut* (with whom were *Gans and Haman,* on the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellants sued the appellee on a policy of insurance which included what is known as the "iron safe clause." At the conclusion of the case the Court refused two prayers offered by the plaintiff and granted two instructing the jury to render a verdict for the defendant. The rulings on those prayers present the only questions for our consideration.

The appellants were engaged in the millinery business, trimming hats and selling them. They had been on High street, in Baltimore City, but on the 23rd of January, 1909, moved to Baltimore street, where they still were at the time of the fire at which the loss occurred, November 26th, 1909.

The policy of insurance was for the term of one year from the 22nd of September, 1909, being for $1,000.00 on the stock of merchandise and $200.00 on the furniture and fixtures. The business was run by Mrs. Mankowitz, the wife of one, and Miss Joffe, the daughter of the other appellant. Miss Joffe was absent the day of the fire by reason of illness, and Mrs. Mankowitz and a Miss Rosen, who was employed to trim hats, were at the store on that day. Mr. Mankowitz was a tailor, but he kept the books, paid the bills, etc., for the millinery business, going to the store every night and at other times when he was not engaged in his regular occupation. He was not working the day of the fire, but sometime before it started he had left the millinery store to pay a bill which was due.

When Miss Joffe was there it was her custom to go to dinner at 12 o'clock and return at half-past twelve, and then Mrs. Mankowitz would go, but as Miss Joffe was not there on November 26th, 1909, Mrs. Mankowitz and Miss Rosen left for dinner at the same time—12 o'clock. Mrs. Mankowitz went to her brother-in-law's, which was near the store, and only intended to be away twenty minutes or half an hour. She locked the store door, and while she was at luncheon heard an alarm of fire, and upon going out on the street found it was at their store. After the fire was discovered a neighbor broke the door open, but the stock of goods was practically ruined by fire and water and the fixtures were very much injured.

By the first prayer granted the jury was instructed "that it appears from the plaintiffs' own evidence that they failed to comply with the provisions of the policy sued on, known as the Iron Safe Clause," and by the second, "that it appears from the plaintiffs' own evidence that the plaintiffs did not keep the books required by the condition of the policy." Each of them concluded with an instruction that the verdict must be for the defendant.

The clause in this policy relied on was as follows:

"IRON SAFE CLAUSE.

*Warranty to Keep Books and Inventories and to Produce Them
in Case of Loss.*

The following covenant and warranty is hereby made a part
of this policy:

1st. The assured will take a complete itemized inventory of
stock on hand at least once in each calendar year, and unless
such inventory has been taken within twelve calendar months
prior to the date of this policy, one shall be taken in detail
within 30 days of issuance of this policy, or this policy shall be
null and void from such date, and upon demand of the assured
the unearned premium from such date shall be returned.

2nd. The assured will keep a set of books, which shall clearly
and plainly present a complete record of business transacted,
including all purchases, sales and shipments, both for cash and
credit, from date of inventory as provided for in the first sec-
tion of this clause and during the continuance of this policy.

3rd. The assured will keep such books and inventory and also
the last preceding inventory, if such has been taken, securely
locked in a fireproof safe at night, and at all times when the
building mentioned in this policy is not actually open for busi-
ness, or, failing in this, the assured will keep such books and
inventories in some place not exposed to a fire which would
destroy the aforesaid building.

In the event of failure to produce such set of books and
inventories for the inspection of this company, this policy shall
become null and void, and such failure shall constitute a per-
petual bar to any recovery thereon."

Mr. Mankowitz admitted that they did not have a safe,
but testified that every night he carried such books as they
had to his brother's store, which according to his evidence
was about six or seven houses away, and according to that
of his brother, was about ten houses from the one in which
the fire occurred. He arranged with his brother that the
books were to be taken to the latter's store every night, when
the plaintiff's store was closed and then taken back in the
morning. They were kept in a drawer in the brother's
store, as the latter's safe was already full. On the morn-

ing of the fire Mr. Mankowitz got the books and took them to the store.

We do not understand the appellee to claim that the plaintiffs could not keep the books at the brother's, as they were kept there, but the important question is whether the store was actually open for business at the time of the fire within the meaning of the policy. As the books and inventory were not kept in a safe, it was undoubtedly the duty of the plaintiffs to keep them in some place not exposed to a fire which would destroy the building, at night and at all times when the building was not actually open for business. It cannot be doubted that in a literal sense the building was not actually open for business when the fire occurred, and it would seem to be equally clear that if it had been open, the probabilities are that the fire would not have been so disastrous (if it had occurred at all), and at any rate the books could have been easily saved. They are thus described in the testimony: "Three of them were small books of the size of the one produced, and one was a two hundred page ledger; the book produced was a book about twelve inches long by four inches wide by three-quarters of an inch thick, weighing about six ounces. The ledger was a little wider and a little thicker." An inventory made just before they moved to Baltimore street was in one of the books. All but one of them totally destroyed by the fire, and that was what Mr. Mankowitz called "the sales book." They could by reason of their size very easily have been taken to his brother's when Mrs. Mankowitz went there to dinner.

It is true that she only expected to be absent about half an hour, but she was gone long enough for the fire to make such headway that according to the plaintiff's claim, the stock was practically destroyed and the fixtures very much damaged. If it be conceded that the plaintiffs had such books and inventory as this clause required, the very object of the requirement was defeated by reason of the plaintiff's representative leaving them where they were, unprotected in case of fire in her absence. If an insured can relieve

himself of the obligation of his warranty to produce the
books and inventory in case of fire by shutting up his store
for half an hour with no one in it, and claiming the books,
etc., were kept but were destroyed, there is but little pro-
tection to the insurer by such a clause, and it might as well
be abandoned.  If it can be done for half an hour, then why
not for an hour or more?

Such a clause in an insurance policy should undoubtedly
receive "a fair and reasonable interpretation," as the authori-
ties have frequently said of it, but it will be observed that in
considering such a question as the one now before us, the
Courts have been largely governed by the circumstances of
each particular case, rather than attempting to lay down gen-
eral rules.  When there is no question about which cause the
loss having been without the fault or negligence of the
owner, Courts naturally shrink from placing such a inter-
pretation on a clause of this kind as will deprive the owner
of a right to recover, by reason of a purely technical defence,
if that can be properly avoided, but even then when the
terms of the contract are clear and unambiguous, Courts
have no right to make new contracts for the parties, or ignore
those already made by them simply to avoid seeming hard-
ships.  A review of the many decisions on this Iron Safe
Clause will show a tendency in some instances to do more
for the protection of the insured than they seemed ready to
do for themselves, although the clause has been very gen-
erally recognied as valid and reasonable, and has been
declared to be useful and desirable, not simply for the insurer
but for the honest insured.

It may be that it might be well to require by legislation
insurance companies making use of it, to make it so prom-
inent in the policies or to give such notice of it as will leave
no question about the insured having notice of it, when it is
inserted in or attached to a policy, as we do not understand
that all standard policies on stocks of merchandise contain
it, but in this case the plaintiffs knew of it, and hence do
not even have the excuse of their ignorance of such provision.

They knew of the necessity of taking their books out of the building when the store was not actually open for business and presumably they knew the object of such a provision. If they had had a safe in the store, it would not have been unreasonable to require them to place those four little books in the safe before shutting up the store and leaving it without protection. The undoubted fact is that the store-room was left unprotected long enough to give the fire such headway as to consume the contents before anyone could extinguish it. Customers not only could not enter the room, but those who discovered the fire could not, until the door was finally broken open. And, as we have already indicated, the store being closed without anyone in charge and the books being left there exposed have deprived the insurer of the kind of evidenc of the loss it was by the express terms of the contract entitled to. We do not feel justified in saying that because it was intended to close the store for half an hour and then open it again, it was, during the half-hour in which the fire occurred, actually open for business, and hence the clause in the policy does not apply. The provision not only says the building must be open for business to avoid the necessity of putting the books in a safe, or in the alternative, keeping them in some place where they would not be exposed to a fire in the building, but it says *actually* open for business. It can not be correctly said that a store is *"actually* open for business," when it is *actually* locked up, with no one in it, for half an hour, and no one there to attend to business or protect the property.

It will be observed that by section 1 of this clause, a policy becomes null and void if the inventory is not taken as required, and hence we held in *Reynolds* v. *German Am. Ins. Co.,* 107 Md. 110, that the policy had become null and void by the assured failing to take an inventory within the time limited, and that it was not revived by his making an inventory afterwards, although before a loss by fire, but in section 3, the one applicable here, the insured is required to keep the books and inventories as herein provided, and

"In the event of failure to produce such set of books and inventories for the inspection of this company, this policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon." The latter does not make a policy null and void merely because the assured does not keep his books in a safe, or as provided in the alternative, but the failure to produce the books and inventories has that effect and constitutes a bar to recovery for a loss sustained. In other words, if there had been no fire the closing of the store on this occasion would not have invalidated the policy, but as the fire did occur, and did confessedly prevent the books and inventories from being produced, then there can be no recovery in the absence of such books and inventories, unless the assured did what they agreed to do, for the safe keeping of the books and inventories, or can be excused from not doing so.

In that connection we would add that we would have no hesitation in holding that if an assured, acting in good faith, placed the books in a safe which he believed to be fireproof, or in some place which he had the right to believe was not exposed to a fire which would destroy the building, the mere failure to produce the books would not necessarily be a bar to his recovery. On the contrary, we could readily concur in the view taken by the Supreme Court in *Liverpool Fire Ins. Co.* v. *Kearney,* 180 U. S. 132, and other cases on such a question. Mr. Justice Harlan said: "We are of the opinion that the failure to produce the books and inventory, referred to in the policy, means a failure to produce them if they are in existence when called for, or if they have been lost or destroyed by the fault, negligence or design of the insured," and as the failure to produce them in this case was by reason of the fault and negligence of the plaintiffs, in leaving them in the store when it was not actually open for business, they can not be excused.

The cases relied on by the appellants on this point were *Sun Mutual Ins. Co.* v. *Jones,* 54 Ark. 376; 15 S. W. 1034; *Jones* v. *Ins. Co.,* 38 Fed. 19; *Major* v. *Ins. Co.,* 112 Mo.

App. 235, and *Phoenix Ins. Co.* v. *Schwartz,* 115 Ga. 113. In the two first named, which referred to the same fire, it was held that the store was still open for business. In the Missouri case a physician who had a drug store responded to an urgent call to see an ill patient, and during his absence of ten or fifteen minutes the fire occurred. He had a safe, but did not put the books in it in his absence and did not remember whether he had locked the door of the store. The Court said the store was still open for business. In the Georgia case there was a suspension of business caused by a fire raging in the neighborhood, and threatening the building. In none of those cases did the Courts think the parties were at fault, but we can not say that of these plaintiffs.

In the case of *Aetna Ins. Co.* v. *Johnson,* 127 Ga. 491, as annotated in 9 *Am. & Eng. Ann. Cases,* 466, a number of cases are cited on the various phases of the Iron Safe Clause, and although some of them may not be entirely in accord with the conclusion reached by us, none of them have gone so far as we would have to go in order to relieve the appellants of the consequences of their own deliberate acts which resulted in this loss. In this State we have not followed the construction of insurance contracts adopted by some other Courts, but as JUDGE McSHERRY said in *Agric. Ins. Co.* v. *Hamilton,* 82 Md. 88; "In *Kelly's Case,* 32 Md. 421, and in *Weaver's Case,* 70 Md. 539, this Court repudiated the principle of interpretation adopted in some cases, that insurance contracts are to be construed more strongly against the underwriter; and adopted the sounder view that the intention of the parties, as gathered from the whole instrument, must prevail."

As in our judgment the plaintiffs cannot recover by reason of the provision contained in section 3 of this clause, it is unnecessary to discus the question whether sufficient books were kept or whether the inventory made at High street was a sufficient compliance with the clause.

The only remaining question for our consideration is, whether the policy can be treated as divisibles and recovery

allowed for the fixtures. The cases in the various jurisdictions have differed greatly on that question, but in this State the decisions have adopted the view that such a contract as this is an entire one. In *Ass. Fireman's Ins. Co.* v. *Assum,* 5 Md. 165, there was a policy of insurance to the amount of one thousand dollars—seven hundred dollars on stock of books and stationery and three hundred dollars on music, musical instruments, fancy goods, bronze powder and medicines. The policy provided that if the assured "shall hereafter make any other insurance on the hereby insured premises," he shall notify the company "or in default thereof, this policy shall cease and be of no effect." The Court held "that the proper construction of the covenant is, that *if any part of the goods* mentioned therein was afterwards insured in any other insurance office without notice to the appellants, as provided in the covenant, the policy thereby becomes void and of no effect." In *Bowman* v. *Franklin Fire Ins. Co.,* 40 Md. 620, the policy contained a provision that an incumbrance on the property insured must be assented to by the company, "otherwise the policy shall be void." Part of the insurance was on the building and part on the machinery therein, and there were judgments against the owner which were liens on the real estate. JUDGE ALVEY said: "The difficulty in the plaintiff's way is, that the contract is entire. The consideration for it was entire; and in such case the contract is held to be entire, although its subjects may consist of several distinct and wholly independent items. Moreover, this stipulation in regard to the forfeiture, applied to the policy as an entirety." See also *Agric. Ins. Co.* v. *Hamilton, supra,* and *Norris* v. *Conn. Fire Ins. Co.,* 115 Md.

In this case the consideration was not only entire, but the stipulation as to the forfeiture applied to the policy as an entirety—"this *policy* shall become null and void, and such failure shall constitute a perpetual bar to *any* recovery thereon." That the authorities differ widely on this subject can be seen by reference to the notes to *Republic County*

*Mutual Fire Insurance Co.* v. *Johnson,* in 2 *Am. & Eng. Ann. Cases,* 22. See also 9 *Ibid.* 470, and the case of *Coggins* v. *Aetna Insurance Co.* (N. C.), 1907; 56 S. E. 506, where cases on both sides are cited. But in view of our own decisions on the question of the divisibility of the contract, and of the language of the policy itself, we feel constrained to hold that there can be no recovery in this case for the reasons given. The judgment will, therefore, be affirmed.

> *Judgment affirmed, the appellants to pay the costs.*